# 65 Mass. App. Ct. 521 (2006)     521

Kourouvacilis *v.* American Federation of State, County and Municipal Employees.

DIANE KOUROUVACILIS *vs.* AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES & another.[1]

No. 04-P-1747.

Hampden. September 13, 2005. - February 9, 2006.

Present: LAURENCE, KAFKER, & TRAINOR, JJ.

*Attorney at Law,* Lien, Withdrawal, Suspension. *Rules of Professional Conduct.*

This court concluded that the suspension of an attorney for ethical misconduct barred him from recovering compensation for legal services rendered prior to the disciplinary action — whether pursuant to a contingent fee agreement, in a quantum meruit action, or in a proceeding to enforce the statutory lien — where the penalized misconduct was related to the case in which the services were rendered and for which the attorney sought a fee, and where the penalized misconduct impaired the value of the client's cause of action or otherwise imperiled the client's right to relief [527-533]; further, this court concluded that there was no merit to the argument that the attorney's conduct should not be imputed to his law firm, where the attorney's misconduct was committed within the normal scope of legal representation, and where, given his disciplinary history, the attorney's acts were foreseeable [533-535].

[1]Monson State Hospital (Monson). As the motion judge observed, the caption of this case does not reflect the real parties in interest in the instant proceeding. This appeal involves the propriety of the summary judgment dismissal of a "motion to determine and enforce" an attorney's charging lien (pursuant to G. L. c. 221, § 50), filed by the law firm of Louis Kerlinsky, P.C. (Kerlinsky, P.C.), on the proceeds of a settlement effected by the law firm of Cooley, Shrair, P.C. (Cooley, Shrair), for plaintiff Kourouvacilis in an underlying "unjust employment termination" and "unfair representation" case against. Monson and the American Federation of State, County and Municipal Employees (AFSCME). That case had been commenced on Kourouvacilis's behalf by attorney Louis Kerlinsky but was taken over by Cooley, Shrair, after Kerlinsky was compelled to withdraw following his suspension from law practice by the Supreme Judicial Court for unethical conduct. In this proceeding, Kerlinsky, P.C., is, therefore, effectively the plaintiff, and Cooley, Shrair, is effectively the defendant. Kourouvacilis was not a participant in the proceedings below, nor is she in this appeal, although, if the lien were enforceable, Kourouvacilis would be responsible for payment to the extent she received any "proceeds derived" from her "cause of action" as a result of the settlement. G. L. c. 221, § 50. See note 10, *infra.*

522           65 Mass. App. Ct. 521 (2006)

Kourouvacilis *v*. American Federation of State, County and Municipal Employees.

CIVIL ACTION commenced in the Superior Court Department on December 1, 1987.

Following review by this court, 53 Mass. App. Ct. 116 (2002), the case was heard by *Tina S. Page*, J., on motions for summary judgment.

*Norma Kerlinsky* for Louis Kerlinsky, P.C.

*Dawn D. McDonald* for Cooley, Shrair, P.C.

LAURENCE, J. This case involves a novel issue: whether an attorney forfeits his right to his charging lien (under G. L. c. 221, § 50) by virtue of being suspended from the practice of law by the Supreme Judicial Court for unethical conduct in a separate litigation when that misconduct was related to, and arguably caused harm to, his client's interests in the case in which the lien is sought to be enforced. We affirm a Superior Court judge's summary judgment ruling that, in the circumstances presented, the attorney cannot enforce the lien, although we do so on different grounds from those relied on by the judge.

*Background.* In November, 1985, Diane Kourouvacilis retained attorney Louis Kerlinsky[2] on a contingent fee basis to represent her in an action against General Motors (GM) and Avis Rent-A-Car (Avis) for personal injuries she allegedly sustained when a GM automobile she had purchased from Avis caught fire while she was driving. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 707 (1991); *Matter of Kerlinsky*, 428 Mass. 656, 660, cert. denied, 526 U.S. 1160 (1999) (*Kerlinsky II*). Kourouvacilis subsequently retained Kerlinsky in November, 1987, for the litigation that underlies this appeal

---

[2]Below and here, the appellant, identified in the notice of appeal as "Louis Kerlinsky, P.C.," has persistently drawn a distinction between itself and its "former employee," attorney Louis Kerlinsky individually (who is listed as Kourouvacilis's original lawyer on the docket, was the sole signatory to Kourouvacilis's pleadings in the underlying action until he was suspended from practice, acted as the sole trial attorney, and was the only lawyer who expended time [allegedly over 600 hours] on the case during that period), to support the proposition that Kerlinsky's unethical conduct should not be attributed to his law firm so as to deny the firm its lien. The motion judge and we have rejected this argument (see *infra* at 533-536), although we will herein distinguish Kerlinsky personally from his law firm (Kerlinsky, P.C.) whenever clarification so requires.

(again on a contingent fee basis[3]) to represent her in a wrongful termination action against the Commonwealth of Massachusetts and Monson State Hospital (Monson) (collectively, the Commonwealth)[4] in which she also alleged breach of the duty of fair representation against her union, American Federation of State, County and Municipal Employees (AFSCME).[5]

On December 3, 1997, Kerlinsky was suspended from the practice of law by the Board of Bar Overseers (board) for two years.[6] *Kerlinsky II*, 428 Mass. at 659. Although the suspension

[3]Since this contingent fee agreement does not appear in the record, we do not know if Kerlinsky, P.C., complied with our rules governing such agreements. See Mass.R.Prof.C. 1.5(c), as amended, 432 Mass. 1301 (2000) ("a contingent fee agreement shall be in writing and signed in duplicate by both the lawyer and the client within a reasonable time after the making of the agreement"). In the absence of such an agreement, an attorney is only entitled to fees from the client by establishing a quantum meruit basis for recovery. *Boswell* v. *Zephyr Lines, Inc.*, 414 Mass. 241, 249-250 (1993).

[4]The various claims against Monson included breach of contract, wrongful termination, breach of the implied covenant of good faith and fair dealing, intentional infliction of emotional distress, handicap discrimination, and Federal and State civil rights violations.

[5]Kourouvacilis's claims against the Commonwealth and AFSCME were bifurcated. The Superior Court dismissed all of her claims against the Commonwealth, except for breach of contract. Kourouvacilis's tort claims were dismissed for Kerlinsky's failure to have made proper presentment under the Massachusetts Tort Claims Act. The claim under G. L. c. 151B was dismissed for Kerlinsky's failure to have proceeded through the Massachusetts Commission Against Discrimination. The claims under the civil rights statutes were dismissed because the Commonwealth is not a "person" subject to suit under those statutes. The claim against AFSCME proceeded to trial (Kourouvacilis then being represented by Kerlinsky), where the jury found in favor of Kourouvacilis as to liability. A hearing on damages was scheduled for a later date but never took place.

[6]In 1994, bar counsel had filed a petition for discipline against Kerlinsky for alleged violations of numerous ethical rules under the Commonwealth's former ethical regime, the Code of Professional Responsibility (also known as the Canons of Ethics and Disciplinary Rules, see 359 Mass. 787 [1972]). *Kerlinsky II*, 428 Mass. at 657 n.1. After several days of hearings, a hearing committee of the board concluded that Kerlinsky had violated DR 6-101(A)(3); DR 7-101(A)(1), (2), and (3); DR 7-102(A)(2) and (7); and DR 7-102(B)(1). *Id.* at 658. After appeal and remand by an appeal panel of the board, the hearing committee found that Kerlinsky's violations of DR 7-101(A)(1), (2), and (3) had been intentional and that he had knowingly violated DR 7-102(A)(2) and (7). *Id.* at 658-659. In recommending a two-year suspension, the appeal panel adopted the findings of the hearing committee but also found (contrary to the hearing committee) that Kerlinsky had violated DR 1-102(A)(4), (5),

arose out of his conduct in the automobile fire action, his unethical conduct was found to be related to, and to have had an adverse impact upon, Kourouvacilis's wrongful discharge case. In his handling of the automobile fire case, Kerlinsky was determined to have performed a perfunctory and inadequate investigation of the automobile fire, to have failed to have the car inspected by an expert (before it was sold for salvage), and to have failed to investigate Kourouvacilis's claims of personal injury. *Id.* at 660-661. He failed to counsel his client to correct misstatements she made in her deposition. *Id.* at 661. He prepared an affidavit and answers to interrogatories that falsely represented that expert witnesses were available to testify in support of Kourouvacilis's claims. *Id.* at 661-662.

Most pertinently, Kerlinsky made deliberate misstatements regarding Kourouvacilis's employment and lost wages allegedly resulting from the automobile fire, which constituted the unethical conduct directly related to the unlawful termination case. In answers to interrogatories propounded by GM, he allowed his client to claim that she only lost two weeks of wages, while in answers to Avis's interrogatories, he advanced the client's claim that she was not employed for two years after the automobile fire because of resulting emotional problems, and that she had a lost earning capacity of $36,000. *Id.* at 662.

The Supreme Judicial Court (SJC) specifically found that these inconsistent interrogatory answers were detrimental to the unlawful termination suit:

> "These statements were not only inconsistent as between GM and Avis, but *they contradicted and jeopardized the theory of Kourouvacilis's Monson suit.* In that case, Kourouvacilis claimed that she was ready and able to work after her 1984 termination, but had been unable to find work until June, 1986. [Kerlinsky] advanced these misstatements of his client, and did not counsel her to correct

and (6). *Id.* at 659. Based on the appeal panel's report, the board recommended Kerlinsky be disciplined. A single justice of the Supreme Judicial Court suspended Kerlinsky from practice for two years on December 3, 1997. *Ibid.* Kerlinsky appealed to the full court, which affirmed the board's findings but vacated the decision of the single justice as unduly lenient and issued an order suspending him for three years. *Ibid.*

either the misstatements or the inconsistencies." (Emphasis added.)

*Ibid.* The SJC found "more than adequate evidence to support" all of the charges of Kerlinsky's intentional and knowing ethical violations, which represented "fraudulent, dishonest conduct . . . prejudicial to the administration of justice, and reflected adversely upon [his] fitness to practice . . . ." *Id.* at 662, 664. In sum, Kerlinsky "neglected his client's case. He prosecuted a frivolous claim, needlessly consuming the resources of the judicial system for several years. He filed false and misleading affidavits and interrogatory answers." *Id.* at 664. In increasing Kerlinsky's suspension from two to three years, the SJC relied not merely on the large number of ethical violations he had committed in the GM-Avis case but also on his record of past misconduct. The court found it significant that Kerlinsky "continued to engage in the unethical behavior at issue in this case during the pendency of and subsequent to . . . earlier disciplinary proceedings."[7,8] *Id.* at 665.

As a result of the suspension, Kerlinsky was required to withdraw from all of his cases, including the wrongful discharge action. See S.J.C. Rule 4:01, § 17(1)(a), as amended, 426 Mass. 1301 (1997). Kourouvacilis retained Cooley, Shrair, P.C. (Cooley, Shrair), as successor counsel. Louis Kerlinsky, P.C.

---

[7]The SJC emphasized that in *Matter of Kerlinsky*, 406 Mass. 67 (1989) (*Kerlinsky I*), Kerlinsky "was publicly censured in 1989 for charging a fee in excess of the fee set out in the contingent fee agreement." *Kerlinsky II*, 428 Mass. at 665. The court observed that his "continu[ing] to engage in the unethical behavior" was evidence that he "lacks any appreciation that his behavior was improper and violated the Canons of Ethics." *Id.* at 665, 666. Considering Kerlinsky's history of disciplinary difficulties and the significance accorded it by the SJC, we deem the statement in Kerlinsky, P.C.'s, brief that Kerlinsky's unethical conduct was "clearly unforeseeable" because he had "never been suspended or disbarred" in forty-five years to be disingenuously misleading and beyond the bounds of appropriate appellate advocacy.

[8]Kerlinsky, P.C., while insisting on separating itself from Kerlinsky individually, nonetheless devotes much of its brief to defending Kerlinsky's conduct in the automobile fire suit and the unlawful termination suit and otherwise attacking the specific rulings made by the SJC (among which was a ruling that it was Kerlinsky himself who agreed to represent Kourouvacilis, with no mention whatever of Kerlinsky, P.C.) and the alleged deprivation of Kerlinsky's due process rights by the SJC. We decline to consider these arguments, as the SJC's pronouncements in Kerlinsky's disciplinary proceeding are final.

526                     65 Mass. App. Ct. 521 (2006)

Kourouvacilis *v.* American Federation of State, County and Municipal Employees.

(Kerlinsky, P.C.), along with Kerlinsky individually and his wife, Norma Kerlinsky, thereafter served and filed a notice of attorney's lien against Kourouvacilis; Cooley, Shrair; and the named defendants in the unlawful termination suit.[9] Cooley, Shrair, ultimately settled that case for $50,000, receiving $20,000 for its efforts (whether on the basis of a contingent fee agreement or reasonable time spent being unclear from the record). The action was then dismissed pursuant to a stipulation.

In October, 1999, Kerlinsky, P.C., filed a "motion to determine and enforce" its claimed attorney's lien against the proceeds of the settlement. A judge of the Superior Court (not the motion judge here) denied the motion after concluding that "no statutory basis exists to enforce any lien." On Kerlinsky, P.C.'s, appeal, this court vacated the order on the authority of *Craft* v. *Kane*, 51 Mass. App. Ct. 648, 652-653 (2001), and remanded the case because the judge erred in failing to recognize that a stipulation of dismissal constitutes a judgment within the meaning of the attorney's lien statute. *Kourouvacilis* v. *AFSCME*, 53 Mass. App. Ct. 1116 (2002).[10]

Following the remand, Cooley, Shrair, and Kerlinsky, P.C., cross-moved for summary judgment on the latter's attorney's lien motion. A judge of the Superior Court denied Kerlinsky, P.C.'s, motion but allowed Cooley, Shrair's. The judge determined that Kerlinsky (and through him Kerlinsky, P.C.) had waived the right to any attorney's lien because Kerlinsky's

---

[9]The entitlement to an attorney's lien is derived from G. L. c. 221, § 50, which provides, in pertinent part: "From the authorized commencement of an action, counterclaim or other proceeding in any court, or appearance in any proceeding before any state or federal department, board or commission, the attorney who appears for a client in such proceeding shall have a lien for his reasonable fees and expenses upon his client's cause of action, counterclaim or claim, upon the judgment, decree or other order in his client's favor entered or made in such proceeding, and upon the proceeds derived therefrom." Norma Kerlinsky, who argued the appeal, claims to be the sole stockholder, director, and officer of Kerlinsky, P.C., although the record does not contain documentation establishing that entity's organization.

[10]Kerlinsky, P.C., settled with the Commonwealth in April, 2000, upon receiving payment of $10,000. The then-pending appeal against the Commonwealth and Monson was accordingly dismissed pursuant to Mass.R.A.P. 29(b), as amended, 378 Mass. 943 (1979), with prejudice and without costs to any party. We presume that the remaining $20,000 of the settlement proceeds were provided to the client, Kourouvacilis. See Mass.R.Prof.C. 1.15(c), 426 Mass. 1363 (1998).

withdrawal from Kourouvacilis's case had not been for "good cause."[11] This appeal followed.

*Discussion.* Whether an attorney forfeits, or waives, his right to an attorney's lien by engaging in unethical conduct harmful to his client's case that compels his withdrawal from the representation before the case is concluded is a question our appellate courts have not before addressed. It has been judicially determined that an attorney does not waive his right to the lien by voluntarily withdrawing from the representation in certain circumstances. See *Phelps Steel, Inc.* v. *Von Deak*, 24 Mass. App. Ct. 592, 593-594 (1987), and cases cited. "[I]f, for example, withdrawal occurs because of a breakdown in the lawyer-client relationship, illness of the lawyer, or development of an unforeseen, and reasonably not foreseeable, conflict of interest the attorney's lien remains intact." *Id.* at 594. In determining whether the circumstances of withdrawal were sufficiently justified to preserve the lien, the critical issue is whether the attorney had "good cause to withdraw." *Ibid.* See *Eliot* v. *Lawton*, 7 Allen 274, 276 (1863); *Powers* v. *Manning*, 154 Mass. 370, 377 (1891). It is this "good cause" analysis that the lower court judge relied on in finding that Kerlinsky, P.C. — charged with responsibility for Kerlinsky's actions under ordinary agency principles — was not entitled to an attorney's lien, because Kerlinsky's withdrawal due to suspension from practice for unethical conduct did not constitute good cause.

---

[11]Cooley, Shrair, did not argue waiver in its summary judgment papers, instead contending that Kerlinsky, P.C., was not entitled to any fees under the lien on a quantum meruit basis because Kerlinsky's unethical and "substandard" services had seriously impaired the value of Kourouvacilis's claim and because of a total failure to provide any evidence supporting the services rendered or accounting for time spent. Kerlinsky, P.C.'s, criticism on appeal of the judge for having decided the summary judgment motions sua sponte on a basis (waiver) not briefed or argued by any party "without giving [Kerlinsky,] P.C. the opportunity to respond or rebut," is misdirected, since it never requested such an opportunity and fails to provide any authority demonstrating reversible error by the judge for proceeding thus. It is, in any event, irrelevant, since the standard of review of a grant of summary judgment is whether, on established material facts construed in favor of the nonmoving party, the moving party was entitled to judgment as matter of law, and the reviewing court can consider any ground that supports the judgment even if the judge's stated basis was wrong. See *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991).

528                                65 Mass. App. Ct. 521 (2006)

Kourouvacilis *v.* American Federation of State, County and Municipal Employees.

We are unpersuaded by the judge's stated basis for allowing summary judgment. As an objective matter, Kerlinsky's withdrawal from further representation of Kourouvacilis plainly rested on "good," i.e., proper, cause: it was required by law. Massachusetts Rules of Professional Conduct 1.16(a)(1), 426 Mass. 1369 (1988), mandates withdrawal "if . . . the representation will result in violation of the rules of professional conduct or other law." The SJC's disciplinary decision suspending Kerlinsky from the practice of law for three years was a legal command that Kerlinsky's continued representation of Kourouvacilis — i.e., his failure to withdraw — would have violated. Such representation in the face of the temporary disbarment resulting from the three-year suspension also would have violated G. L. c. 221, § 41, penalizing the unauthorized practice of law. Additionally, S.J.C. Rule 4:01, § 17(1)(a), explicitly requires such withdrawal. Kerlinsky's withdrawal, was, therefore, actuated by the most compelling of good causes — the law itself, as pronounced by the Commonwealth's highest court.

The judge's ultimate conclusion — that Kerlinsky, P.C., had no right to enforce the attorney's lien because of Kerlinsky's unethical conduct prejudicial to his client — can nevertheless be upheld on any correct legal ground that supports the judgment on the record, regardless of whether the judge's stated reasons were sound. See *West Broadway Task Force* v. *Boston Hous. Authy.*, 414 Mass. 394, 397-398 (1993); *Doeblin* v. *Tinkham Dev. Corp.*, 7 Mass. App. Ct. 720, 722 (1979). Such valid alternative grounds exist here.

Since the attorney's lien is a "tool for recovery of legal fees," *Boswell* v. *Zephyr Lines, Inc.*, 414 Mass. 241, 248 (1993), which was created as a matter of public policy to protect attorneys' right to compensation for services legitimately rendered, see *PGR Mgmt. Co., Inc., Heath Properties* v. *Credle*, 427 Mass. 636, 640 (1998), the right to enforce the lien may be considered, legally as well as functionally, the equivalent of the right to compensation. The relevant issue here, therefore, becomes whether Kerlinsky, P.C., has a right to compensation for Kerlinsky's legal services to Kourouvacilis in the unfair termination case in these circumstances, most pointedly in light

of Kerlinsky's suspension for unethical conduct that "jeopardized the theory" of the case.

As previously noted, no Massachusetts authority on the issue appears to exist. Two principal lines of authority have emerged in other jurisdictions concerning an attorney's right to compensation after he has been suspended or disbarred before completion of his services for the client. Under one view, supportive of the judge's challenged ruling here, the fact that an attorney was suspended or disbarred is regarded as the equivalent of unjustified voluntary abandonment of the client and precludes recovery for legal work performed prior to the disciplinary action. See *In re Woodworth*, 85 F.2d 50, 51 (2d Cir. 1936), superseded by statute on other grounds as stated in *Banner* v. *Bagen*, 186 B.R. 824 (1995) (withdrawal because of disbarment forfeits attorney's right to lien because "[t]he attorney's incapacity follows from his own wrongful act"); *Fletcher* v. *Krise*, 120 F.2d 809, 812 (D.C. Cir.), cert. denied, 314 U.S. 608 (1941) ("appellant's disbarment deprived him of any right to compensation either under his contract or on a quantum meruit [basis]"); *Kimmie* v. *Terminal R.R. Assn. of St. Louis*, 344 Mo. 412, 420 (1939) (in rejecting attorney's request for legal fees, court equated attorney's suspension with a voluntary abandonment of his contract of employment); *Davenport* v. *Waggoner*, 49 S.D. 592, 597 (1926) (attorney disbarred while case was pending on appeal found to have abandoned his contract "without just cause," thereby "forfeit[ing] all right to payment for any services previously rendered"); *Royden* v. *Ardoin*, 160 Tex. 338, 342 (1960) (court denied attorney's request for compensation for services rendered prior to suspension because "[h]is disbarment or suspension is considered tantamount to and to have the same effect as a voluntary abandonment, for the attorney by knowingly and willfully practicing such a course of conduct that would lead to the termination of his right to practice, renders it impossible to complete the work that he engaged to perform").

A second line of authority does not bar recovery per se, but rather allows a disbarred or suspended attorney to recover the reasonable value of services rendered prior to the discipline in certain situations. See *Eisenberg* v. *General Motors Acceptance*

530                                    65 Mass. App. Ct. 521 (2006)

Kourouvacilis v. American Federation of State, County and Municipal Employees.

*Corp.*, 761 F. Supp. 20, 22 (E.D. Pa. 1991); *In re Mekler*, 672 A.2d 23, 24 (Del. 1995); *Harris Trust & Sav. Bank* v. *Chicago College of Osteopathic Med.*, 116 Ill. App. 3d 906, 909 (1983); *Pollock* v. *Wetterau Food Distrib. Group*, 11 S.W.3d 754, 773 (Mo. Ct. App. 1999) (distinguishing *Kimmie, supra*); *Stein* v. ·*Shaw*, 6 N.J. 525, 527 (1951); *Flecha* v. *Goodman*, 31 Misc. 2d 444, 445 (1961).[12] In these cases, most pertinently, either the courts stated explicitly that the attorney was disciplined for conduct unrelated to the case at hand, or the facts of the case demonstrated the lack of relationship.[13] See *Eisenberg*, 761 F. Supp. at 21 (attorney resigned "for reasons unrelated to his representation of the defendant"); *Harris Trust*, 116 Ill. App. 3d at 907 (attorney "disbarred for making several material false statements on his application for admission to the bar"); *Pollock*, 11 S.W.3d at 773 (plaintiff's lawyer "disbarred for reasons wholly unrelated" to the case); *Stein*, 6 N.J. at 526, 528 (attorney disbarred "for reasons not connected in anywise with the prosecution of the defendant's suit" and "wholly unrelated to his client's case"); *Flecha*, 31 Misc. 2d at 445 (court noted that there was no "claim of any misconduct in this action which, itself, would destroy such lien").[14]

The reasoning behind allowing suspended or disbarred at-

---

[12]Most New York courts seem to follow the rule allowing compensation in some circumstances. See *Potts* v. *Hines*, 144 A.D.2d 189, 189-190 (N.Y. 1988) (attorney may recover in quantum meruit for services rendered prior to suspension where attorney was suspended for conduct unrelated to case); *Posner* v. *Messinger*, 197 A.D.2d 508, 509 (N.Y. 1993) (suspended partner entitled to share in partnership profits earned prior to, but collected after, his suspension); *Tiringer* v. *Grafenecker*, 38 Misc. 2d 29, 30 (N.Y. Sup. 1962) (attorney is entitled to fees for services provided before disbarment "[a]bsent any showing that [he] was disbarred for conduct in connection with the case in question"); *Mitchell* v. *B.A.S.F.*, 145 Misc. 2d 930, 931 (N.Y. Sup. 1989). But see *In re Woodworth*, 85 F.2d at 51. See also *Gary* v. *Cohen*, 34 Misc. 2d 971, 975 (N.Y. Sup. 1962) (positing, but not deciding, whether an attorney's disbarment or suspension bars him from receiving compensation for services performed prior to disciplinary action).

[13]Some cases allowing recovery fail to discuss the conduct for which the attorney was suspended. See, e.g., *Cooper* v. *Texaco, Inc.*, 961 F.2d 71 (5th Cir. 1992); *In re Mekler, supra*.

[14]At least one court has drawn a distinction between an attorney's claim for fees against his client and a claim against another lawyer, allowing recovery in the latter situation but not necessarily in the former. See *Sympson* v. *Rogers*, 406 S.W.2d 26, 32 (Mo. 1966). Another court has suggested that other relevant considerations may include whether the attorney had substantially

65 Mass. App. Ct. 521 (2006)                            531

Kourouvacilis *v.* American Federation of State, County and Municipal Employees.

torneys to recover in some circumstances was, in our view, most persuasively discussed in a thoughtful opinion by the New Jersey Supreme Court:

> "We are of the opinion that the plaintiff should be permitted to recover in quasi contract for the reasonable value of his services rendered and disbursements made prior to his disbarment, for otherwise the defendant [i.e., client] will be unjustly enriched at the expense of the plaintiff. To deprive an attorney of his claim for any and all compensation for services rendered prior to his disbarment *when the services are not involved in the unprofessional conduct occasioning disciplinary action*, would be inequitable. There is no sound reason in law or morals for permitting the defendant to use the plaintiff's disbarment as an escape from paying him for services rendered or necessary disbursements made by him in her behalf . . . . Disbarment is not a form of outlawry. . . . [W]e cannot subscribe to the theory . . . that withdrawal from a suit by reason of disbarment constitutes a voluntary abandonment of the contract without just cause. Such is actually not the fact in those cases. The contract was not voluntarily abandoned, it was automatically terminated by operation of law, when the order of the court made further performance impossible. While the plaintiff was disbarred because of his own wrongful acts, so far as this defendant is concerned he is guiltless. It is pure fiction to say that he has intentionally and without cause abandoned his contract with her . . ." (Emphasis added.)

*Stein,* 6 N.J. at 527-528 (Vanderbilt, C.J.). What is clear from *Stein* and the other similarly reasoned cases, however, as noted above, is that there is a necessary condition for recovery of fees, namely, that the unethical conduct resulting in discipline was not related to the case in which the attorney seeks a fee. Although Kerlinsky, P.C., cites and relies on some of these cases allowing recovery by the disciplined attorney, it fails to take into account the critical fact that they are all distinguishable, because here the unethical conduct occasioning the

---

completed work on the case prior to the loss of his license and whether the attorney was disbarred for active, affirmative wrongdoing or for passive misconduct (such as client neglect). See *Gary* v. *Cohen,* 34 Misc. 2d at 975.

532                  65 Mass. App. Ct. 521 (2006)

Kourouvacilis *v.* American Federation of State, County and Municipal Employees.

discipline was related to, and, indeed, directly affected, the case in which the attorney is attempting to collect fees under the lien.[15]

On the facts of this case, we hold that disbarment or suspension of an attorney for ethical misconduct bars him from recovering compensation for legal services rendered prior to the disciplinary action — whether on a contingent fee agreement, in a quantum meruit action, or in a proceeding to enforce the statutory lien — when the penalized misconduct was (as here) related to the case in which the services were rendered and for which a fee is sought and impaired the value of the client's cause of action or otherwise imperiled the client's right to relief. As the SJC observed, Kerlinsky's misstatements in interrogatory answers in the automobile fire case "were not only inconsistent as between GM and Avis, but they contradicted and jeopardized the theory of Kourouvacilis's Monson suit," i.e., this case. *Kerlinsky II*, 428 Mass. at 662.

Although the record is insufficiently complete to evaluate the merits of Kourouvacilis's unjust termination claim with any degree of precision,[16] we can confidently conclude that Kourouvacilis was damaged by Kerlinsky's misconduct in several ways.

---

[15]Not only do the cases allowing fees plainly indicate that the attorney's recovery of compensation would be disallowed upon proof that the unethical conduct that led to his suspension or disbarment was related to the case in which fees are sought, but their uniform emphasis on allowing fee recovery in unrelated matters in order to avoid the client being "unjustly enriched" (see *Eisenberg*, 761 F. Supp. at 22; *Harris Trust*, 116 Ill. App. 3d at 910; *Stein*, 6 N.J. at 527; *Flecha*, 31 Misc. 2d at 446) clearly implies that the unrelated unethical activities did not harm the client. Otherwise, it could not be fairly said that the client would be unjustly enriched by disallowing compensation.

[16]The situation is somewhat analogous to that in a legal malpractice action. There, the plaintiff alleging malpractice by her former attorney in handling a litigation cannot rest on conclusory allegations or presumptions in order to establish causation, i.e., proximately caused damages, but rather must prove that, but for the attorney's negligence, a favorable judgment or better settlement would probably have been obtained, a requirement often referred to as the "trial within a trial." See *Fishman* v. *Brooks*, 396 Mass. 643, 647 (1986); *Glidden* v. *Terranova*, 12 Mass. App. Ct. 597, 600 (1981). No such presentation of the merits of Kourouvacilis's unjust termination case appears on this record, and the issue of damages was never developed prior to settlement. Nonetheless, for the reasons stated *infra*, the record does allow certain reliable inferences as to the adverse effect of Kerlinsky's unethical conduct on Kourouvacilis's claim.

First, she was put to the unanticipated burden of retaining new counsel in mid-stream upon Kerlinsky's withdrawal, a circumstance that, as a matter of common sense and experience, inevitably results in added transition costs. Moreover, she eventually had to pay combined lawyers' fees that exhausted sixty percent of her settlement, a far higher share (to the court's knowledge) than is customary in such cases.[17] Most harmfully, Kerlinsky's ethical breach provided the defendants with documentation to impeach Kourouvacilis's credibility on the most critical issue in the case during cross-examination,[18] potentially crippling the likelihood of her recovering a favorable judgment, probably putting her damages demand at serious risk, and almost certainly diminishing the settlement value of her claim.[19]

There is no merit (as the motion judge correctly ruled) in

---

[17]Kerlinsky, in his affidavit supporting the motion to enforce the attorney's lien, averred that the "customary" attorney's fee in such cases would have been forty percent of the recovery.

[18]Indeed, as an "admission," i.e., an extrajudicial statement of a party opponent, the adverse interrogatory answer could be admitted in evidence against Kourouvacilis. See Liacos, Brodin & Avery, Massachusetts Evidence § 8.8.1 (7th ed. 1999).

[19]The latter conclusion appears buttressed by the sizeable difference between the eventual $50,000 settlement and Kerlinsky's $560,000 valuation for Kourouvacalis's compensatory damages (in the settlement section of Kourouvacilis's pretrial memorandum). It is arguable that Kerlinsky and Kerlinsky, P.C., are entitled to no compensation at all, regardless of harm to the client from Kerlinsky's ethical violations. A lawyer — whose relationship with his client is "highly fiduciary in its nature," *Hendrickson* v. *Sears*, 365 Mass. 83, 90 (1974) — may be denied compensation for services "tainted by the breach of his fiduciary obligations to" his client. *Allen* v. *Moushegian*, 320 Mass. 746, 757 (1947). The extensive list of Kerlinsky's ethical breaches of duties owed to his client is described in *Kerlinsky II*, 428 Mass. at 657-658 & n.1, 662-664. See note 6, *supra.* Moreover, as an agent (who is also a fiduciary, *Dzuris* v. *Pierce*, 216 Mass. 132, 135-136 [1913]) whose compensation was never apportioned to specific periods of time, he may be denied recovery for his services for wilful and deliberate breach of his duty to his client-principal prior to the conclusion of the representation. See *Quinn* v. *Burton*, 195 Mass. 277, 281 (1907); *Lydia E. Pinkham Med. Co.* v. *Gove*, 303 Mass. 1, 6 (1939) ("[A] fiduciary who has been guilty of breach of trust should be required to surrender his compensation"); Restatement (Second) of Agency § 456(b) and comments b & c; § 469 (1958) ("An agent is entitled to no compensation for conduct which is . . . a breach of his duty of loyalty"). A lawyer's duty of loyalty requires that he "should represent a client zealously [but only] within the bounds of the law," and "may not intentionally prejudice or damage his

534        65 Mass. App. Ct. 521 (2006)

Kourouvacilis *v.* American Federation of State, County and Municipal Employees.

Kerlinsky, P.C.'s, repeated assertions that Kerlinsky's unethical conduct should not be imputed to it, or to Norma Kerlinsky, its sole stockholder, director, and officer, because they could not reasonably have foreseen such "clearly inappropriate" conduct. Under ordinary principles of agency, however, a professional corporation is vicariously liable for the tortious conduct of its employee committed within the scope of his employment. See *Bockser* v. *Dorchester Mut. Fire Ins. Co.*, 327 Mass. 473, 477 (1951) ("In general, the fraud of an agent acting in the course of his employment is binding upon his principal"); *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc.*, 408 Mass. 393, 404 (1990) ("An employer may be held vicariously liable for the intentional tort of an agent if the tortious act or acts were committed within the scope of employment"). See generally G. L. c. 156A, § 6(*b*); S.J.C. Rule 3:06(3)-(5), as amended, 423 Mass. 1301-1302 (1996). An act is committed in the scope of an agent's "employment if it is of the kind he is employed to perform, . . . if it occurs substantially within the authorized time and space limits, . . . and if it is motivated, at least in part, by a purpose to serve the employer." *Wang Labs., Inc.* v. *Business Incentives, Inc.*, 398 Mass. 854, 859 (1986). "The fact that the predominant motive of the agent is to benefit himself does not prevent the act from coming within the scope of employment as long as the act is otherwise within the purview of his authority." *Id.* at 859-860.[20]

The record demonstrates that Kerlinsky's misconduct while representing Kourouvacilis was committed within the normal scope of legal representation. See generally Restatement (Second) of Agency § 228 (1958) (discussing relevant criteria for determining if conduct is within the scope of employment). Advising a client with respect to answering interrogatories is among the most common kinds of service a lawyer engaged in litigation performs. Kerlinsky's interrogatory misstatements

client during the course of the professional relationship." Mass.R.Prof.C. 1.3 & comment 1A, 426 Mass. 1313 (1998). See also notes 21 and 22, *infra*.

[20]In a related context, we have imputed a lawyer's actions and knowledge to his professional corporation, rejecting attempts by the firm to qualify as an "innocent insured" under insurance policies. See *Sunrise Properties, Inc.* v. *Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.*, 425 Mass. 63, 68 (1997) ("a corporation cannot absolve itself of its agent's wrongdoing by hiding behind the corporate shield").

were indisputably made during the authorized time, while he was actively engaged in representing Kourouvacilis. We may also infer that his acts were motivated at least in part to serve his firm, Kerlinsky, P.C. Although in retrospect his actions were ill-advised, they may be presumed to have been motivated by a desire to achieve the best financial outcome for his client in both the unlawful termination suit and the automobile fire suit, a pecuniary benefit that would redound directly to Kerlinsky, P.C., particularly on proof of a contingent fee agreement entitling the attorney to a significant percentage of any recovery.[21]

As a final note, we consider peculiarly unpersuasive (indeed, disingenuous) Kerlinsky, P.C.'s, argument that Kerlinsky's acts were unprecedented and unforeseeable, given his disciplinary history expressly deplored and emphasized by the SJC in 1999 as the basis for the substantial enhancement of his suspension.[22]

*Judgment affirmed.*

---

[21]See Restatement (Second) of Agency § 94 (principal's affirmance of agent's unauthorized transaction inferable from principal's failure to repudiate it); § 159 (principal liable for unauthorized acts of agent acting within his apparent authority); § 231 comment a (even agent's tortious or criminal act can bind principal if the act was in nature not substantially different from those the agent would be expected to perform while pursuing a lawful transaction); § 253 comment a (principal who authorized legal proceedings is subject to liability for agent's tortious conduct thereof if such conduct was at least in part intended to carry out the principal's purposes; "[t]he fact that the attorney is subject to discipline by the court does not prevent the [principal] from being liable for his [improper] conduct").

[22]We are not unmindful of § 17(1)(f) of S.J.C. Rule 4:01, as amended, 426 Mass. 1301 (1997) (not cited or relied on by Kerlinsky, P.C.), which requires a suspended lawyer, within fourteen days of his suspension, to "refund any part of any fees paid in advance that have not been earned." Section 17(1)(f) might be read to suggest that, were the attorney in possession of any fees paid by the client in advance, he could retain that portion of those fees which he had "earned" even though he had been suspended or disbarred. We do not consider such a reading to provide a basis for fee recovery here, however, for several reasons.

First, since Kerlinsky, P.C., characterizes its representation of Kourouvacilis as being on a strictly contingent fee basis, and nothing in the record reveals its receipt of any retainer or other advance payment to it by Kourouvacilis, this provision is irrelevant to its present claim. Second, § 17(1)(f) merely restates

the mandatory obligation of all attorneys upon termination of representation. See Mass.R.Prof.C. 1.16(d), 426 Mass. 1369 (1998). It would not, as a matter of normal interpretation, be deemed to give rise to a right of compensation by negative inference, particularly since the entire structure and every provision of § 17 imposes burdens, not benefits, upon the sanctioned attorney, cf. *King* v. *Viscoloid Co.*, 219 Mass. 420, 425 (1914) (courts do not read into a statute a provision the Legislature did not see fit to put there); *Commonwealth* v. *Fall River Motor Sales, Inc.*, 409 Mass. 302, 316 (1991) (a statute is to be read as a whole to produce an internal consistency in keeping with its tenor and pattern); and since rules relating to attorney conduct and discipline are to be construed in favor of the client, not the attorney. Cf. *Kerlinsky I*, 406 Mass. at 73 n.5 (the rules governing contingent fee agreements, as well as such agreements themselves, are to be construed against the attorney).

Finally, as a matter of policy, a lawyer should be regarded as "earning" his fee only when he provides legal services to his client in a manner consistent with his professional duties, which include discharge of his mandatory obligations to his client (a) to act competently by means of "methods and procedures meeting the standards of competent practitioners" (Mass.R.Prof.C. 1.1 comment 5, 426 Mass. 1308 [1998]); (b) to act with diligence and zeal "within the bounds of the law" (Mass.R.Prof.C. 1.3, 426 Mass. 1313 [1998]), taking only "lawful and ethical measures . . . to vindicate a client's cause" (*id.* at comment 1), and "not intentionally [causing] prejudice or damage [to] his client during the . . . relationship" (*id.* at comment 1A); (c) not knowingly to "make a false statement of material fact . . . to a tribunal" (Mass.R.Prof.C. 3.3[a][1], 426 Mass. 1383 [1998]) and not to "assist a witness to testify falsely" (Mass.R.Prof.C. 3.4[b], 426 Mass. 1389 [1998]); and (d) not to engage in professional misconduct involving "dishonesty, fraud, deceit, or misrepresentation" (Mass.R.Prof.C. 8.4[c], 426 Mass. 1429 [1998]). All of these obligations were, according to the SJC's 1999 disciplinary opinion (*Kerlinsky II, supra*), intentionally violated by Kerlinsky. Such conduct by Kerlinsky constituted serious breaches of his fundamental duty of loyalty to his client, particularly his obligations to refrain from conduct involving dishonesty, fraud, deceit, and misrepresentation, and from conduct that harms his client. Restatement (Third) of the Law Governing Lawyers § 16 comment e & Reporter's Note to comment e, at 150 (2000). Breach of that duty of loyalty — at least when it involves, as here, intentional prejudice or damage to the client (see *supra*) — represents such a violation of professional obligation as merits forfeiture of the lawyer's compensation. See Restatement (Third) of the Law Governing Lawyers § 37 & comments a-d; § 40 comment e ("A lawyer who withdraws has the burden [in seeking compensation] of persuading the trier of fact that the withdrawal is not attributable to a clear and serious violation of the lawyer's duty . . . to render loyal and competent service").